UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAKILYA GREEN,

                 Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

_____

DECISION & ORDER

14-CV-6632P

## PRELIMINARY STATEMENT

Plaintiff Shakilya Green ("Green") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") terminating her receipt of Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 8).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 11). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.    Procedural Background

Green was provided childhood SSI benefits based upon a determination by the Social Security Administration ("SSA") that she was disabled as a child due to a learning

disability and attention deficit hyperactivity disorder ("ADHD").  (Tr. 12, 67).  After Green

turned eighteen in March 2010, her eligibility for benefits was redetermined under the adult

disability standards, and the SSA determined that her disability benefits should be terminated

because she was no longer disabled as of September 1, 2010.[1]  (Tr. 60-73).  Green appealed this

determination on November 16, 2010, and a disability hearing was held on September 14, 2011.

(Tr. 57-63, 67).  On September 15, 2011, the SSA denied Green's appeal, concluding that she

was not disabled.  (Tr. 69-72).  Green requested and was granted a hearing before Administrative

Law Brian Kane (the "ALJ").  (Tr. 22, 76-98, 100-18).  The ALJ conducted a hearing on May 2,

2013 in Rochester, New York.  (Tr. 22-54).  In a decision dated July 2, 2013, the ALJ found that

Green was not disabled and was not entitled to benefits.  (Tr. 12-20).

On September 16, 2014, the Appeals Council denied Green's request for review

of the ALJ's decision.  (Tr. 5-8).  Green commenced this action on November 7, 2014 seeking

review of the Commissioner's decision.  (Docket # 1).


## II.     Relevant Medical Evidence[2]

### A.     Educational Records

Records from the Rochester City School District suggest that Green demonstrated

significant academic difficulties throughout her education.  Green repeated the first grade and

was referred for an evaluation due to her academic delays.  (Tr. 241, 248).  The Differential

Ability Scales ("DAS") assessment was administered to Green in 1999, and her verbal score was

73, her nonverbal score was 81, her spatial score was 74, and her general conceptual ability score

---

[1]  Green also sought and was denied child insurance benefits pursuant to 20 C.F.R. § 404.350(a)(5).
(Tr. 12).

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

was 72. (Tr. 262). These scores demonstrated that Green fell substantially below average and within the mentally retarded range. (Tr. 251). Green was assessed to suffer from developmental delays in the areas of cognition, adaptive behavior and academic knowledge, was classified as a student with mental retardation in 1999, and was placed in a 15:1 special education classroom setting. (Tr. 256, 262).

The following year, Green was reevaluated by Kristin P. Sampson ("Sampson"), EdS, a certified school psychologist. (Tr. 221-26). Sampson noted that although Green had originally been placed in a 15:1 classroom, since September 2000 she had been enrolled in a 12:1+1 special education classroom. (*Id.*). Sampson administered the WISC-III intelligent assessment to Green. (*Id.*). The testing results demonstrated that Green had a full scale intelligence quotient ("IQ") of 69, which was within the mildly mentally retarded range. (*Id.*). Her verbal IQ was 72, and her nonverbal IQ was 71. (*Id.*). Sampson opined that these scores were consistent with Green's 1999 DAS testing results. (*Id.*). Sampson also assessed that Green suffered from mild adaptive behavior deficits. (*Id.*). She recommended that Green continue to be classified as a student who is mentally retarded and to be placed in a 12:1+1 classroom setting. (*Id.*).

On October 27, 2009, Green was reevaluated by Heidi Austin ("Austin"), a certified school psychologist. (Tr. 321-25). Austin's report recounted some of Green's academic record. (*Id.*). Austin reported that during the 2001-2002 school year, Green was diagnosed with ADHD and began taking medication. (Tr. 321). In September 2002, Green was administered the Comprehensive Test of Nonverbal Intelligence ("CTONI"). (Tr. 321-25). Her testing results indicated that her nonverbal IQ was 90, her pictorial nonverbal IQ was 89, and her geometric nonverbal IQ was 72. (*Id.*). It was noted that Green had historically "scored lower on

cognitive measures and that the language content of those measures may have caused an underestimate of her potential." (Tr. 303).

After reviewing all of Green's previous testing results, Austin opined that they generally demonstrated that Green functioned within the borderline range of intelligence, with the exception of one score (presumably the CTONI scores) that suggested adequate nonverbal skills and reasoning. (Tr. 321-25). According to Austin, as a result of the 2002 testing that demonstrated average nonverbal cognitive functioning, Green was reclassified as a student with another health impairment. (*Id.*).

Austin reported that Green had attended school in Florida and Syracuse, New York before returning to the Rochester City School District. (*Id.*). According to Austin, while in Syracuse, New York, Green's classification was changed to a student with a learning disability and she received services in a resource room. (*Id.*). She returned to the Rochester City School District in 2006 and was provided resource room services. (*Id.*).

At the time of Austin's evaluation, Green was enrolled in the ninth grade and received resource room services. (*Id.*). She recently had begun attending classes at Edison High School after attending the Young Mother's program. (*Id.*). Green reportedly was not taking her ADHD medication and refused to complete her work or to utilize resource room services. (*Id.*). Austin administered the Woodcock Johnson III Tests of Achievement to Green, and her results demonstrated below grade level academic skills. (*Id.*). Her reading skills were in the borderline range and were estimated to be at the fourth grade level, and her math skills were in the third grade level. (*Id.*). According to Austin, although Green could add, subtract and multiply, she was unable to make purchases and give correct change, divide, compute fractions or complete multi-step word problems. (*Id.*). Austin was unable to assess various areas of Green's

functioning due to Green's frequent absences from school.  (*Id.*).  Austin indicated that due to

her inability to complete a full evaluation, it was difficult to determine whether Green's current

placement was appropriate for her needs.  (*Id.*).  Although Austin believed that Green would

benefit from additional services, she was unable to identify those services without a more

thorough evaluation.  (*Id.*).

   Green's Individualized Education Program ("IEP") was reviewed on March 17,

2010 to assess her needs for the 2010-2011 academic year.  (Tr. 313-20).  The IEP notes

indicated that Green had begun the current academic year on a Home/Hospital instruction after

the birth of her child.  (*Id.*).  She returned to school in October 2009, but her attendance was

poor.  (*Id.*).  She was reportedly absent 78 out of 110 days and had only attended school for 11

days.  (*Id.*).  According to the report, it was difficult to assess Green's progress and needs due to

her absences.  (*Id.*).  Green was expected to enter tenth grade the following year and would

continue to be classified as learning disabled and to be provided resource room services.  (*Id.*).  It

was noted that Green continued to require the support of a special education teacher to progress

in the general education curriculum.  (*Id.*).

   Green's IEP was reviewed on March 17, 2011.  (Tr. 351-61).  The ability to

assess Green's needs and to conduct the review was significantly hampered by Green's irregular

school attendance.  (*Id.*).  At the time of the review, Green's GPA was zero for the 2010-2011

school year, and Green had only accumulated three credits despite having attended high school

since 2006.  (*Id.*).  Green was classified as learning disabled and was provided resource room

services.  (*Id.*).

B.      **Medical Opinion Evidence**

1.      **George Alexis Sirotenko, DO**

On August 26, 2010, state examiner George Alexis Sirotenko ("Sirotenko"), DO, conducted a consultative internal medicine examination of Green, the relevant portions of which are summarized herein.  (Tr. 433-36).  Green reported that she suffered from a learning disability and difficulties with short-term memory.  (*Id.*).  According to Green, she had been attending tenth grade in a special education setting, but had dropped out.  (*Id.*).  She reported that she would be returning to ninth or tenth grade in September 2010.  (*Id.*).  She did not have a driver's license or a permit and reportedly took Ritalin in the past, although she discontinued it because of side effects.  (*Id.*).  She reported that she was able to cook, clean, do laundry, shop, and care for her own personal hygiene.  (*Id.*).  She also reported that she watched television and spent time with friends.  (*Id.*).  During the examination, Sirotenko noted that Green had difficulty focusing, required frequent verbal redirections and simplification of answers, and demonstrated significant difficulty with short-term memory.  (*Id.*).  He suggested that a formal psychological organicity IQ evaluation might be warranted.  (*Id.*).

2.      **Adele Jones, PhD**

On August 17, 2010, state examiner Adele Jones ("Jones"), PhD, conducted a consultative psychiatric evaluation of Green.  (Tr. 429-32).  Green reported that her aunt drove her to the examination and that she and her eleven-month-old daughter had been living with her aunt since her mother's incarceration.  (*Id.*).  Green also reported that she was enrolled in tenth grade, which was scheduled to begin in September.  (*Id.*).  Green indicated that she was enrolled in special education classes due to difficulty reading and writing.  (*Id.*).  Green previously had failed ninth and tenth grades and had no previous employment experience.  (*Id.*).

According to Green, she did not receive mental health treatment, but she did meet with a counselor in school, although she had not met with the counselor during the previous school year. (*Id.*). Green reported experiencing poor appetite, sad feelings, particularly since her mother's incarceration, depression, crying spells, loss of energy, and diminished self-esteem, but no difficulty sleeping. (*Id.*). She also reported a history of auditory hallucinations, although it was unclear when the hallucinations had begun. (*Id.*). Green also reported short and long-term memory deficits and chronic concentration problems. (*Id.*). According to Green, she had previously been prescribed Ritalin, which helped her concentrate, but had discontinued its use because it caused her to vomit. (*Id.*).

Green reported that she was able to care for her personal hygiene and could cook, clean, do laundry, shop, and take public transportation. (*Id.*). She reported an inability to manage her money and stated that her aunt now manages her money. (*Id.*). She reported normal relationships with her family and friends. (*Id.*). Green stated that she spends her day caring for her daughter, going to her father's or daughter's father's house, and spending time with friends, including going to the movies, the beach, or the mall. (*Id.*).

Upon examination, Jones noted that Green appeared casually dressed and groomed, with normal gait, posture, motor behavior, and eye contact. (*Id.*). Jones opined that Green had fluent and clear speech with adequate language, coherent and goal-directed thought processes, restricted affect, neutral mood, clear sensorium, full orientation, fair insight, good judgment, and below average intellectual functioning with a somewhat limited general fund of information. (*Id.*). Jones noted that Green's attention and concentration were intact. (*Id.*). According to Jones, Green could perform simple calculations, but reported an inability to complete serial threes, which Jones attributed to Green's learning disorder, rather than to an

impairment in attention and concentration.  (*Id.*).  Green's memory skills were impaired, likely

due to her limited intellectual functioning.  (*Id.*).  According to Jones, Green could recall three

objects immediately, two out of three objects after five minutes, and could complete six digits

forward and zero digits backward.  (*Id.*).

   According to Jones, Green could follow and understand simple directions and

instructions, perform simple and complex tasks independently, maintain attention and

concentration, maintain a regular schedule and learn new tasks, make appropriate decisions,

relate adequately with others, and appropriately deal with stress through praying.  (*Id.*).  Jones

opined that the examination results were not consistent with psychiatric or cognitive problems

that would significantly interfere with Green's ability to function on a daily basis.  (*Id.*).  Jones

diagnosed Green with learning disabilities, rule out borderline intellectual functioning.  (*Id.*).

She also indicated that Green would need assistance managing her funds due to her learning

disabilities.  (*Id.*).

### 3.  T. Inman-Dundon, Psychology

   On September 3, 2010, agency medical consultant Dr. T. Inman-Dundon

("Inman-Dundon") completed a Psychiatric Review Technique.  (Tr. 437-50).  Inman-Dundon

concluded that Green's mental impairments did not meet or equal listed impairments 12.02 or

12.04.  (Tr. 437-38, 440).  According to Inman-Dundon, Green suffered from moderate

limitations in her ability to maintain concentration, persistence or pace, and mild limitations in

her activities of daily living and ability to maintain social functioning.  (Tr. 447).  According to

Inman-Dundon, Green had not suffered from repeated episodes of deterioration.  (*Id.*).

Inman-Dundon completed a mental Residual Functional Capacity ("RFC") assessment.

(Tr. 451-54).  Inman-Dundon opined that Green suffered from moderate limitations in her ability

to understand, remember and carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals and make plans independently of others.  (*Id.*).  According to Inman-Dundon, Green was able to perform the basic demands of simple, unskilled work.  (*Id.*).

### 4.    Scott Gaskill, LMSW

On March 27, 2013, Green's counselor Scott Gaskill ("Gaskill"), LMSW, completed a mental RFC assessment.  (Tr. 459-60).  Gaskill opined that Green suffered from moderately severe[3] limitations in her ability to carry out detailed instructions, work in coordination with or proximity to others without being distracted, respond appropriately to unexpected changes in the work setting and routine, and set realistic goals and make plans independently.  (*Id.*).  He also concluded that Green suffered from moderate limitations[4] in her ability to remember locations and work-like procedures, understand and remember short and simple repetitive instructions or tasks, maintain attention and concentration for at least two hours with at least four such sessions in a workday, make simple work-related decisions, complete a normal workday or workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rests, interact appropriately with the general public or customers, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to expected changes in the work

---

[3]  Moderately severe was defined to indicate that "the activity is not totally precluded but is substantially impaired in terms of speed or accuracy of carrying out the task and can only be engaged in occasionally or seldom during an eight hour day; *e.g.*, short durations (5-15 minutes) not totaling more than two hours in an eight hour day."  (Tr. 459).

[4]  Moderate limitations was defined to indicate that "the activity is somewhat impaired (can be performed at 80-85% of expected or normal levels in terms of speed and accuracy of carrying out the task) but can be engaged in occasionally to frequently (1/3 – 2/3 of a day) but not constantly or continuously."  (Tr. 459).

setting and routine.  (*Id.*).  He also indicated that her work-related limitations would be exacerbated by unruly customers, production demands or quotas, demands for accuracy, attendance requirements, and the need for quick, accurate and independent decisions.  (*Id.*).  Gaskill indicated that he had been treating Green since October 2012, but believed that her impairments had existed since childhood.  (*Id.*).  He also indicated that Green had not been evaluated by a psychiatrist because she was not open to taking medication.  (*Id.*).

### III.   Non-Medical Evidence

Green was born in 1992 and was approximately twenty-one years old at the time of the administrative hearing.  (Tr. 22, 132).  In connection with her request for benefits, Green's grandmother Marge Rose ("Rose") completed an adult function report on Green's behalf. (Tr. 331-38).  According to Rose, Green lived with family and spent her day caring for herself and her daughter and spending time with her family.  (*Id.*).  She was reportedly able to care for her own personal hygiene, although she sometimes lacked the energy or desire to care for her hair or prepare meals.  (*Id.*).

Rose reported that Green prepared meals approximately twice per week.  (*Id.*).  Her mother prepared the remainder of her meals.  (*Id.*).  Green was also reportedly able to perform household chores, including laundry, ironing, sweeping, dishes, cleaning rooms, making beds and dusting, although the quality of her work was not always good and she sometimes became overwhelmed with chores.  (*Id.*).  According to Rose, Green had difficulty paying attention and was easily distracted or overwhelmed.  (*Id.*).  She also reported that Green had difficulty learning new tasks, adjusting to change, and remembering things.  (*Id.*).

According to Rose, Green left the house every day and could use public transportation, but did not have a driver's license. (*Id.*). She also went shopping for groceries and personal care items twice monthly. (*Id.*). Green was unable to pay her own bills or manage a savings account, although she was able to count change. (*Id.*). Her hobbies included playing football, reading, and watching television. (*Id.*). According to Rose, Green would talk on the phone with her friends, but in person was quiet and usually preferred to keep to herself. (*Id.*). Rose indicated that Green frequently visited her father's house and her daughter's father's house. (*Id.*).

Green's aunt Sharia Calahan ("Calahan") submitted an affidavit in support of Green's request for benefits. (Tr. 350). Calahan indicated that she went to Green's house every day to assist her with cooking, household chores, and shopping. (*Id.*). Calahan also indicated that she provided transportation to Green and that Green had gotten lost taking public transportation by herself. (*Id.*). Calahan also indicated that Green did not handle conflict in an age-appropriate manner and avoided dealing with her problems. (*Id.*).

During the administrative hearing, Green reported that her disability benefits were managed by her aunt. (Tr. 28). According to Green, her aunt assisted with bill payments and provided Green with money once a month to purchase household necessities. (Tr. 29).

Green reported that she was twenty-one years old and had attended special education classes in school until the ninth grade. (Tr. 39). Green reported that she was in ninth grade for three years before being dismissed from school due to her advanced age and failure to obtain sufficient credits to graduate. (Tr. 41-42). Green reported that she had difficulty with reading and math and was enrolled in a program to obtain her GED. (Tr. 39-40). According to

Green, she was referred to the program by the Learning Disability Association ("LDA").  (*Id.*).
According to Green, she was failing the math and reading portions of the program.  (*Id.*).

Green testified that she had received mental health counseling from Gaskill for
several months for depression, which was characterized by crying spells, loneliness, and suicidal
thoughts.  (Tr. 44, 50).  Green stated that she had difficulty maintaining attention and learning
new tasks.  (Tr. 45-46).  She also reported difficulty adapting to change, dealing with criticism,
and being around other people.  (*Id.*).  According to Green, she typically interacted with her aunt
and her sisters who lived with her.  (*Id.*).  Green testified that she no longer lived with her aunt,
although her aunt assisted her with transportation.  (Tr. 45, 49).

Green testified that she could cook some meals and that she prepared meals for
her daughter.  (Tr. 47-48).  She also reported that she often required the assistance of her aunt or
her father to shop because she did not know what to buy.  (Tr. 49).  Green testified that although
she was able to get her daughter ready for school, her sisters sometimes helped.  (Tr. 51).

## DISCUSSION

### I.  Standard of Review

This Court's scope of review is limited to whether the Commissioner's
determination is supported by substantial evidence in the record and whether the Commissioner
applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)
("[i]n reviewing a final decision of the Commissioner, a district court must determine whether
the correct legal standards were applied and whether substantial evidence supports the
decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also
Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity;

> (2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

> (3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

> (4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

> (5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.    The ALJ's Decision

In his decision, the ALJ followed the proper analysis for evaluating disability

claims.  (Tr. 12-20).  At step two, the ALJ concluded that Green has the severe impairments of

borderline intellectual functioning, learning disability, ADHD, and adjustment disorder.  (*Id.*).

The ALJ concluded that Green's low back pain was not severe because it did not cause more

than minimal limitation in Green's ability to perform basic work activities.  (Tr. 15).  At step

three, the ALJ determined that Green does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr.15-16). The ALJ specifically considered Listing 12.04. (Tr. 15). With respect to Green's mental limitations, the ALJ found that Green suffered from moderate difficulties in her activities of daily living and in maintaining concentration, persistence or pace, and mild difficulties in social functioning. (*Id.*). The ALJ concluded that since September 1, 2010, Green has had the RFC to perform the full range of work at all exertional levels, but is limited to simple work. (Tr. 16-19). At step four and five, the ALJ determined that Green had no past relevant work, but that other jobs existed in the national and regional economy that Green could perform, including the positions of hand packager and laundry worker. (Tr. 19-20). Accordingly, the ALJ found that as of September 1, 2010, Green was not disabled. (*Id.* at 20).

### B.   <u>Green's Contentions</u>

Green contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and was the product of legal error. (Docket # 10-1). First, Green contends that the ALJ erred because he failed to consider whether Green's impairments satisfied Listing 12.05C and failed to develop the record by ordering an updated intelligence evaluation. (*Id.* at 15-21). Green also maintains that the ALJ erred to the extent that he required a diagnosis of mental retardation. (*Id.* at 22-23). Green also maintains that the ALJ's mental RFC assessment was flawed because he improperly rejected Gaskill's opinion that Green was limited in her ability to work in proximity to others. (*Id.* at 24-25). Green also challenges the ALJ's step five determination because the vocational expert's testimony was based upon a flawed RFC. (*Id.*).

II.    **Analysis**

A.    **Step Three Determination**

If a claimant's impairments meet or medically equal the criteria set forth in Appendix 1 to Subpart P of Part 404 of the regulations, the claimant is automatically entitled to benefits.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("[t]he Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability") (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  The claimant carries the burden of demonstrating that her impairments meet or are equal in severity to one of the listings, and the claimant is required to show that her impairment meets each of the medical criteria set forth in the listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (impairment does not qualify if it "manifests only some of those criteria, no matter how severely").

An ALJ is required to explain his determination that a claimant failed to meet or equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the [l]istings."  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009).  Nevertheless, "[a]n ALJ's unexplained conclusion [at] step three of the analysis may be upheld where other portions of the decision and 'other clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence."  *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) (citing *Berry*, 675 F.2d at 468-69 (affirming ALJ's decision at step three even though ALJ did not articulate his rationale "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence")); *see also Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) ("[a]lthough we have cautioned that an ALJ 'should set forth a sufficient rationale in

16

support of his decision to find or not to find a listed impairment,' the absence of an express

rationale . . . does not prevent us from upholding [the determination] so long as we are 'able to

look to other portions of the ALJ's decision and to clearly credible evidence in finding that his

determination was supported by substantial evidence'") (quoting *Berry*, 675 F.2d at 469); *Sava v.

Astrue*, 2010 WL 3219311, *4 (S.D.N.Y. 2010) (affirming determination of ALJ at step three

where there was "sufficient uncontradicted evidence in the record to provide substantial evidence

for [that] conclusion").  In contrast, "where the evidence on the issue of whether a claimant

meets or equals the listing requirements is [in] equipoise and 'credibility determinations and

inference drawing is required of the ALJ' to form his conclusions at step [three], the ALJ must

explain his reasoning."  *Ryan v. Astrue*, 5 F. Supp. 3d at 507-08 (quoting *Berry*, 675 F.2d at 469).

Listing 12.05C, entitled "Mental Retardation,"[5] (the "Listing") provides in

relevant part:

> *Mental Retardation*: Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in
> adaptive functioning initially manifested during the developmental
> period; i.e., the evidence demonstrates or supports onset of the
> impairment before age 22.  The required level of severity for this
> disorder is met when the requirements in A, B, C, or D are
> satisfied.

>> C.    A valid verbal, performance, or full scale IQ of 60
>>        through 70 and a physical or other mental
>>        impairment imposing an additional and significant
>>        work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05C.  Thus, to establish that she meets the Listing,

Green must demonstrate: "(1) significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested before age 22; (2) a valid IQ score of 60

---

[5]  "Listing 12.05(C) was amended in August 2013 to change the phrase 'mental retardation' to 'intellectual disability'" without changing the substantive requirements of the listing.  *Gibbs v. Colvin*, 2015 WL 9217081, *4 n.2 (W.D.N.Y. 2015).  This amendment postdates the ALJ's decision.

through 70; and (3) another severe physical or mental impairment." *Miller v. Astrue*, 2009 WL 2568571, *4 (N.D.N.Y. 2009).

Green contends that the ALJ erred in concluding that she did not have an impairment or combination of impairments that met or medically equaled the requirements of Listing 12.05C.  (Docket # 10-1 at 15-16).  Green has marshalled evidence from the record that she contends is consistent with the Listing requirement, with the exception of the valid IQ score. (*Id.* at 17-22).  According to Green, had the ALJ properly developed the record by ordering a consultative intelligence evaluation, the record might have demonstrated that she has an IQ within the Listing range.  (*Id.*).  The government disagrees, asserting that the ALJ's rationale may be gleaned from his discussion of the medical evidence.  (Docket # 11 at 18-20).  The government also contends that the record establishes that Green does not satisfy the requirements of Listing 12.05C and that the ALJ was not required to order an intelligence evaluation.  (*Id.* at 22-24).

As an initial matter, I agree with Green that the ALJ failed to consider Listing 12.05.  In his step three decision, the ALJ referenced only Listing 12.04, and the factors that he considered in his step three determination relate to Listing 12.04, not 12.05.  (Tr. 15-16).  The ALJ's failure to consider Listing 12.05C is curious because Green's attorney argued in both his pre-hearing brief and during the hearing that Green met Listing 12.05C.  (Tr. 27, 347-38).  On this record, the ALJ's failure to evaluate Listing 12.05C is puzzling.[6]

With respect to the first requirement of the Listing – evidence of deficits in adaptive functioning that were initially manifested prior to age twenty-two – the record contains

---

[6]  I also reject any argument that the ALJ properly declined to consider Listing 12.05C because Inman-Dundon failed to consider whether Green met or equaled that Listing.  (Docket # 11-1 at 20). Inman-Dundon's opinion is silent with respect to the Listing, and that silence does not provide a basis for the ALJ to decline consideration of the Listing.

conflicting evidence.  "Adaptive functioning refers to an individual's '[ ] ability to cope with the challenges of ordinary everyday life.'"  *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (quoting *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007)).  "Courts have enumerated examples of daily activities that evidence adequate adaptive functioning: successful education in regular classes as opposed to special education courses, living on one's own, taking care of children without help, paying bills and managing one's own finances, and engaging in productive social relationships."  *Marmer v. Colvin*, 2014 WL 1365471, *5 (E.D.N.Y. 2014).

Objective testing in the record demonstrates adaptive deficits when Green was approximately eight years old.  (Tr. 224, 226).  Further, Green was originally classified as mentally retarded and was provided a special education classroom of 12:1+1.  (Tr. 225).  Although her classification was later changed, the record demonstrates that Green was not able to successfully graduate from high school and that she repeated several grades before finally aging out of school.  (Tr. 39-42, 321-25).  As the ALJ noted in his decision, despite her cognitive limitations, Green is able to perform substantial activities of daily living, including living alone, caring for her child and her own personal hygiene, preparing food, and completing household chores.  (Tr. 17).  The record also reflects, however, that Green is unable to manage her own finances, has never been employed, cannot drive, has not been able to obtain her GED, and, according to Calahan, requires substantial assistance to complete her daily activities.  Thus, the record contains clearly conflicting information regarding the first Listing requirement.

The government does not appear to contest that substantial evidence supports the third prong of the Listing – the existence of another physical or mental impairment that imposes an additional and significant work-related limitation on Green.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05C.  In his decision, at step two of the analysis, the ALJ found that Green had

other severe mental impairments, including a learning disability, ADHD, and adjustment disorder.  *See Lyons v. Colvin*, 2014 WL 4826789, *12 (N.D.N.Y. 2014) ("[t]he Second Circuit 'has not yet ruled on what test should be utilized with respect to § 12.05(C)[,]' . . . [but] '[t]he district courts of the Second Circuit have generally adopted the view of the First, Eighth, and Tenth Circuits to the effect that "a limitation other than low IQ is 'significant' if the claimant suffers from an additional physical or other mental impairment that is 'severe' as that term is defined at step two of the Commissioner's sequential analysis"'") (quoting *Edwards v. Astrue*, 2010 WL 3701776, *6 (N.D.N.Y. 2010) and *Salem v. Colvin*, 2014 WL 975696, *5 n.4 (N.D.N.Y. 2014)); *Marmer v. Colvin*, 2014 WL 1365471 at *4 ("[t]his [c]ourt has held that the correct standard for determining whether an impairment in addition to low IQ imposes a significant work-related limitation under Section 12.05(c) is the severity test"); *Swain v. Astrue*, 2014 WL 1315399, *9 (W.D.N.Y. 2014) (severe impairment at step two can satisfy third prong of Listing 12.05C).

The final characteristic of the Listing requires evidence of a valid verbal, performance, or full scale IQ score of between 60 and 70.  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05C.  The parties agree that although the record contains testing results reflecting Green's intellectual ability, none of the scores in the record are valid because they are above 40, are more than two years old, and were obtained before Green turned sixteen.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.00(D)(10); *Swain v. Astrue*, 2014 WL 1315399 at *9 (intelligence scores contained in school records were too stale where they reflected testing before age sixteen). Green maintains that the ALJ should have developed the record by obtaining a current assessment of her intellectual functioning.  (Docket # 10-1 at 16-18).

As the ALJ recognized and the government has conceded, the record contains substantial evidence that Green suffers from cognitive impairments, including the results of several different tests administered to Green during her youth.  Green received a full scale IQ score of 69 when administered the WISC-III in October 2000, which, if valid and not inconsistent with other evidence in the record, would satisfy the Listing.  (Tr. 223).  In addition, both consulting examiners recognized that Green suffered from cognitive deficits that required additional evaluation.  Sirotenko specifically suggested that a psychological organicity IQ evaluation might be warranted (Tr. 436), and Jones attributed Green's attention, concentration and memory deficits to her limited intellectual functioning, assessed that her intellectual functioning was below average, and indicated that borderline intellectual functioning should be ruled out (Tr. 431-32).  Despite recognizing that the intelligence scores reflected in Green's educational records are stale, the government nonetheless maintains that a gap in the record does not exist because the ALJ properly rejected Green's 2000 WISC-III score in favor of testing results administered in 1999 and 2002.  (Docket # 11-1 at 21).  This argument is flawed for several reasons.

As an initial matter, the 1999 DAS and 2002 CTONI scores are invalid because they are more than two years old and were obtained before Green's sixteenth birthday.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.00(D)(10).  Even if the scores were valid, however, the ALJ did not provide a valid basis for rejecting the WISC-III scores in favor of the DAS or CTONI scores.  Although "it is within the purview of an ALJ to 'reject an IQ score as invalid when it is inconsistent with the record,'" the ALJ must provide a basis for his conclusion that the scores were invalid or explain his decision to adopt one set of scores over the others.  *Carpenter v. Comm'r of Soc. Sec.*, 2014 WL 859160, *4 (N.D.N.Y. 2014) (quoting *Juckett ex rel. K.J. v.*

*Astrue*, 2011 WL 4056053, *7 (N.D.N.Y.), *report and recommendation adopted*, 2011 WL 4055296 (N.D.N.Y. 2011)).  In his decision, the ALJ noted that the 1999 DAS scores and the 2002 CTONI scores "indicated a higher ability and are not within the range of mental retardation" (Tr. 17), but did not articulate any reason for rejecting the 2000 WISC-III scores or explain how those scores were inconsistent with the record.

Indeed, the regulations express a preference for "IQ measures that are wide in scope and include items that test both verbal and performance abilities."  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(D)(6)(d).  Unless special circumstances dictate use of tests that evaluate only nonverbal intelligence, such as the CTONI, the regulations discourage reliance on these narrower evaluations.  *Id.*  Moreover, when "more than one IQ is customarily derived from the test administered, e.g., where verbal, performance and full scale IQs are provided in the Wechsler series," the ALJ is directed to use the lowest of the scores in evaluating whether a claimant meets the IQ requirements of the Listings.  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(D)(6)(c).  The lowest scores from the DAS and CTONI assessments were each 72, just outside the range specified in 12.05C.  Those scores, if valid, are sufficiently low that they could provide a basis for a determination of equivalency to Listing 12.05C.  *Swain*, 2014 WL 1315399 at *9 ("IQ scores between 71 and 75 can provide a basis for a determination of *equivalency* to Listing 12.05C") (quoting *Johnson v. Barnhart*, 312 F. Supp. 2d 415, 426 (W.D.N.Y. 2003)).

In sum, although none of the scores contained in the record are valid due to their age, they reveal that Green suffered from substantial cognitive deficits as a child – a conclusion supported by other evidence in the record.  Under such circumstances, assuming that Green satisfied the other two requirements of Listing 12.05C, intelligence testing would appear to be necessary.  *See Wallace v. Colvin*, 2015 WL 4662919, *4 (W.D.N.Y. 2015) (claim of limited

intellectual capacity may be supported by record evidence, including conclusions of consulting and examining physicians that claimant's intellectual functioning appeared to be in the "borderline" range, evidence of claimant's significant educational difficulties, and evidence of her "inability to perform common tasks like learning to drive or manage personal finances"; "[b]ecause the plaintiff's intellectual capacity cannot be reasonably ascertained from the evidence of record, the matter is remanded for the limited purpose of further developing the record with regard to [claimant's] cognitive limitations, including the obtainment of I.Q. testing, so that the applicability of Listing 12.05 can be properly considered"); *Swain*, 2014 WL 1315399 at *9 (claimant's school records that included evidence of IQ scores in borderline range "would have required the ALJ to order an intelligence exam to assess [claimant's] current intelligence level") (collecting cases); *Dufresne v. Astrue*, 2013 WL 1296376, *8 (N.D.N.Y.) (ALJ failed to develop record by ordering intelligence evaluation where record contained evidence of claimant's limited intellectual functioning, including claimant's failure to graduate from high school or obtain GED and opinion of consultative examiner that claimant suffered from cognitive delays and estimating his intelligence to be in the deficient range), *report and recommendation adopted*, 2013 WL 1289759 (N.D.N.Y. 2013); *Laveck v. Astrue*, 2012 WL 4491110, *6 (N.D.N.Y. 2012) (ALJ failed to develop record by not ordering an intelligence exam where claimant testified that she had poor school performance and where consultative psychiatric exam suggested low average cognitive functioning; "there [was] scant medical evidence with regard to [claimant's] cognitive abilities[;] . . . [in] the absence of any evidence relating to this impairment, the ALJ should have ordered a consultative intelligence exam").  At the very least, the ALJ would have to articulate clearly the basis for his conclusion that

intelligence testing was not required to reach a conclusion that Siracuse did not meet the

requirements of Listing 12.05C.

   In this case, the ALJ's determination does not make clear whether he considered

the Listing or, if he did, which of the Listing criteria he found Green failed to meet.  The

evidence discussed above, which includes both supporting and conflicting evidence, requires

more, and the ALJ's general discussion of Green's cognitive limitations does not satisfy his duty

to explain why Green fails to meet Listing 12.05.  Considering the ALJ's failure to explain his

reasoning and the existence of conflicting medical evidence in the record, I am unable to

conclude that substantial evidence supports the ALJ's step three conclusion.  *Ambrosia v. Colvin*,

2015 WL 4887366, *7 (W.D.N.Y. 2015) (remanding where the record contained conflicting

evidence regarding Listing 12.05C, but where ALJ only considered Listings 12.02, 12.08 and

12.09; "the court finds that the ALJ's failure to consider whether plaintiff's mental impairments

met or equaled the criteria for establishing 'intellectual disability' under Listing 12.05C

constitutes legal error that disregards highly probative evidence, requiring remand to the

Commissioner for further consideration"); *Rembert v. Colvin*, 2014 WL 950141, *8 (W.D.N.Y.)

("[a]ny argument from the Commissioner that the ALJ effectively reviewed the standards for

Listing 12.05 are not persuasive under the circumstances here[;] . . . the ALJ's entire analysis for

step three rests on Listings 12.02, 12.06 and 12.08[,] . . . [and] the ALJ's analysis in step four

[does not] compensate"), *report and recommendation adopted*, 2014 WL 1338830 (W.D.N.Y.

2014); *Carpenter v. Comm'r of Soc. Sec.*, 2014 WL 859160 at *4 (remanding where ALJ failed

to consider Listing 12.05C; "while the ALJ clearly did not believe that the record as a whole

supported a diagnosis of mild mental retardation, . . . she failed to specifically address [the

requirements of Listing 12.05C] – and this is not a situation '[w]here application of the correct

legal standard could lead to only one conclusion'") (quoting *Schaal v. Apfel*, 134 F.3d at 504);

*Backus v. Astrue*, 2008 WL 4519006, *11 (N.D.N.Y. 2008) ("[t]he ALJ's failure to specifically

address Listing 12.05(C) is, under the facts of this case, reversible error, because the [c]ourt

cannot engage in meaningful judicial review"); *Johnson v. Barnhart*, 312 F. Supp. 2d at 426

(remanding for ALJ to evaluate whether claimant met Listing 12.05 where school records

reflected an IQ of 72). Although the ALJ may ultimately conclude on remand that Green's

impairments do not meet or equal the Listing, "this possibility does not relieve the ALJ of his

obligation to discuss the potential applicability of Listing [12.05C], or at the very least, to

provide [Green] with an explanation of his reasoning as to why [Green's] impairments did not

meet any of the listings." *Norman v. Astrue*, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012). In sum, I

conclude that remand is warranted for the ALJ to consider whether Green meets or equals the

requirements of the Listing and, if not, to provide an explanation for his determination.

### B.      Green's Remaining Challenges

Green also maintains that the ALJ erred by requiring a diagnosis of mental

retardation. (Docket # 10-1 at 22-23). I do not necessarily interpret the ALJ's decision as

requiring a diagnosis of mental retardation, although he clearly found the apparent absence of

such a diagnosis to be significant. (Tr. 17). Insofar as the ALJ's decision suggests that Green

may not meet the requirements of Listing 12.05C without a diagnosis of mental retardation, that

suggestion is legally incorrect. *See Decarlo v. Astrue*, 2009 WL 1707482, *5 (N.D.N.Y. 2009)

(Listing 12.05C does not require a formal diagnosis of mental retardation; "[b]y requiring

[p]laintiff to have a formal diagnosis of mental retardation, the ALJ has applied an improper

legal standard, which necessitates remand").

In addition, Green challenges the ALJ's RFC assessment, his credibility determination, and his step five determination.  (Docket # 10-1 at 23-27).  Because I have concluded that remand is warranted at step three, I decline to reach Green's remaining challenges as the ALJ's reevaluation at step three may affect his analysis of the remaining steps in the sequential evaluation.  *See Yeomas v. Colvin*, 2015 WL 1021796, *20 (W.D.N.Y. 2015) (collecting cases).

I do note, however, that the administrative record did not contain any records from LDA, where Green apparently received assistance in addressing her cognitive impairments, or from Genesee Mental Health, where Green apparently received mental health treatment.  The record reflects that Green's attorney attempted to obtain the records, but had difficulty doing so. (Tr. 25, 52).  The ALJ's decision suggests that he may have discounted Gaskill's opinion in part because the treatment records were not included in the record.  (Tr. 18).  On remand, the ALJ should consider obtaining Gaskill's treatment records and, if successful, evaluate those records along with the other record evidence in determining Green's claim, including the proper weight to accord to Gaskill's opinion.  *See Welsh v. Colvin*, 2016 WL 836081, *11 (W.D.N.Y. 2016) ("the ALJ's decision suggests that he discounted or did not credit the information in [the treating counselor's] letter because her treatment notes were not contained in the record[;] . . . [this was] not [a] permissible reason[] to discount the information supplied by [the treating counselor], particularly without first contacting [the counselor] or attempting to obtain her treatment records").

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 11**) is **DENIED**, and Green's motion for judgment on the pleadings (**Docket # 10**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.  On remand, the Commissioner should evaluate the requirements of Listing 12.05, including, if necessary, obtaining an adult intelligence evaluation for Green that reflects valid IQ scores.  Additionally, the Commissioner should consider obtaining Green's records from LDA and Genesee Mental Health.

**IT IS SO ORDERED.**

       *s/Marian W. Payson*
       MARIAN W. PAYSON
      United States Magistrate Judge

Dated: Rochester, New York
   March 14, 2016